# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

FLAT BRANCH MORTGAGE, INC.,      )
         )
       Plaintiff,      )
     v.          )     Case No. 23-04143-CV-C-BP
         )
DEREK FRICKE,          )
         )
       Defendant.      )

## ORDER (1) OVERRULING OBJECTIONS AND
## (2) ADOPTING SPECIAL MASTER'S REPORT AND RECOMMENDATION

This case involves an employment agreement between Flat Branch Mortgage, Inc. ("Flat Branch") and one of its former branch managers, Derek Fricke ("Fricke"). The parties' claims and counterclaims assert Fricke was either overpaid or underpaid. Some of Flat Branch's financial records are discoverable, but setting appropriate limits has been difficult. Resolving the matter required identifying the documents that are available, ascertaining what information the documents contain, and determining what information is sufficiently related to the parties' claims to justify requiring their collection and disclosure. These tasks, particularly identifying the available documents and ascertaining the information they contain, proved to require more attention and focus than the Court could provide in an effective and timely manner, so the Court appointed a Special Master to "[e]valuate the parties' arguments and objections with respect to the various discovery disputes . . . ." (Doc. 28, p. 1.)[1] The Order, *inter alia*, directed the Special Master to file a Report recommending resolutions to the disputed discovery matters and provided that the parties would have fourteen days thereafter to file objections (which would be reviewed *de novo*). (Doc. 28, p. 3.)

---

[1] All page numbers for documents filed with the Court are those generated by the Court's CM/ECF system.

On April 16, 2025, the Special Master filed a Report containing (and explaining) her recommendations. Only one aspect of the Special Master's recommendation is subject to objection, and the Court will focus on that aspect of the Report.[2] And after conducting a *de novo* review, the Court overrules the objection and adopts the Report and Recommendation.

Flat Branch is a mortgage lender, and it entered a Branch Manager Agreement (the "Agreement") with Fricke to manage its branch in Leawood, Kansas. The Agreement calls for Fricke's pay to consist of three components: (1) a salary, (2) a Corporate Incentive Bonus ("CIB"), and (3) a Monthly Branch Bonus ("MBB"). The CIB and MBB are distinct bonuses; moreover, Flat Branch paid Fricke a portion of the CIB in advance and paid him the MBB as it was earned. Fricke's employment ended in May 2022, and Flat Branch initiated this suit, primarily seeking to recover the unearned portion of the CIB it had paid Fricke. Fricke filed counterclaims alleging, *inter alia*, Flat Branch underpaid his MBB.

Fricke's objection to the Report and Recommendation relates to the MBB, and understanding the objection requires understanding how the MBB is calculated and a little bit about Flat Branch's operations. Flat Branch utilizes an automated software system to view and calculate loan pricing information. The first component of the system provides real-time pricing data so its employees (loan originators) working with prospective borrowers can compare rates and terms across different markets. This component also displays Flat Branch's internal requirements (including, significantly, the net margin on the loan). Loan originators use this information to lock in rates for individual loans; the data is then transferred or copied into another program, which automates the remainder of the loan process.

---

[2] Fricke originally objected to two aspects of the Report, but the parties resolved the other objection, so it need not be mentioned here.

In addition to generating revenue from extending loans, Flat Branch bundles and sells loans to investors on the secondary mortgage market. Flat Branch enters such transactions subject to "mandatory execution," which requires it to deliver a specific number of loans regardless of whether it has closed that number of loans; if the necessary number of loans have not closed, Flat Branch must pay a penalty for failing to deliver the requisite number.[3]

Fricke was not a loan originator; however, as the branch manager, he had a role in both (1) setting the branch's net margin and (2) making accommodations in individual cases, which might decrease the net margin on a particular loan. This is particularly relevant given the method for calculating the MBB. The MBB was 50% of "(i) Branch Revenue, less (ii) Branch Expenses, less (iii) Corporate Minimum Charge . . . ." (Doc. 34-5, p. 4 (Branch Manager Agreement, Section II(C).) "Branch Revenue" was defined as the "[n]et margin at time of rate lock" minus "lender credits, including any form of pricing concession given to a customer, regardless of how it is required to be disclosed." (Doc. 34-5, p. 4 (Branch Manager Agreement, Section II(C)(i).)

Through a combination of agreements between the parties and her assessment of the information that should be produced, the Special Master recommends that the Court require Flat Branch to produce documents reflecting information related to the loans that were finalized while Fricke was the branch manager, such as rate lock sheets and non-payroll expenses.[4] However, the Special Master also recommends that the Court "deny Fricke's request for discovery of post-lock/post-closing documents and information." (Doc. 31, p. 2.) This effectively prevents Fricke from obtaining information about Flat Branch's costs, margins, and other financial data related to

---

[3] This contrasts with an arrangement calling for the lender's "best efforts," which requires a lender to supply loans to the investor only if loans close.

[4] These are merely examples; the Court need not recount the information the Special Master recommended that Flat Branch produce because there are no objections to those aspects of the Report and Recommendation.

3

its sales of loans on the secondary market. The Special Master explains that because the MBB is based on Flat Branch's "[n]et margin at time of rate lock," events occurring after rate lock play no part in the MBB's calculation and thus are not germane to Fricke's counterclaim. The Court agrees with this analysis.

An unambiguous contract must be enforced as it is written. *Decatur County Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999).[5]

> Whether a contract is ambiguous is a matter of law. When the court is examining a contract for the purpose of determining whether it is ambiguous, it must give the language a natural and reasonable interpretation. As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction.

*Id*. (quotations and citations omitted). An "ambiguity arises only if the language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain." *Speth v. State Farm Fire & Cas. Co.*, 35 P.3d 860, 862 (Kan. 2001) (cleaned up); *see also O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792-93 (Kan. 2002). Here, the Agreement provides the MBB is based in part on Flat Branch's "net margin," and it specifies the point in time in which net margin is to be measured: at the time of rate lock. Therefore, events occurring after rate lock do not affect the MBB.

In arguing otherwise, Fricke insists the term "net margin" is ambiguous and could conceivably incorporate Flat Branch's sale of loans on the secondary market. However, the phrase "at [the] time of rate lock" is not ambiguous (and Fricke does not argue otherwise), and that phrase determines the time at which net margin is to be determined. As the Special Master aptly put it:

> While the term "net margin" as used in the definition of "branch revenue" is not defined and conceivably may be open to multiple meanings, it is significant that the

---

[5] The Court cites Kansas law because (1) Fricke contends the Agreement should be construed in accordance with Kansas law, (2) Flat Branch does not contend otherwise, and (3) on the matters relevant to this decision, the Court does not believe Missouri or Kansas law are different. The Court's use of Kansas law should not be construed as a determination that Kansas law governs.

4

plain terms of the contract limit the determination of net margin (whatever it may be) to the "time of rate lock." The phrase "at the time of rate lock" is temporal and limits the relevant period to a specific point in time — not a rolling or retrospective measure. Thus, pursuant to the express terms of Fricke's employment contract, the relevant inquiry for Fricke's MBB calculation is the net margin "at time of rate lock" such that discovery should be permitted on the full scope of information and documents that existed at that point in time.

(Doc. 31, pp. 10-11.) For the same reason, by specifying the point in time at which "net margin" is to be assessed, the Agreement excludes consideration of events occurring after the rate is locked.

To further his point, Fricke argues the margin from a loan's sale is not knowable at the time of rate lock, (*e.g.*, Doc. 34, p. 9; Doc. 34-6, ¶ 12), but this does not mean the Agreement's definition of "Branch Revenue" must include the margin from the post-closing sale of the loan. To the contrary, the fact that the margin from a loan's post-closing sale is unknown at the time of rate lock further demonstrates it is not supposed to be included. The Court cannot adopt an interpretation that renders contract terms meaningless, *e.g.*, *Jenkins v. T.S.I. Holdings, Inc.*, 1 P.3d 891, 899 (Kan. 2000), and including post-rate lock events to determine Branch Revenue (as Fricke suggests) would render the clause specifying net margin is measured as of the "time of rate lock" meaningless. Relatedly, Fricke offers no interpretation of the definition that (1) gives meaning to the phrase "time of rate lock" and (2) would make post-lock information germane.

Accordingly, the Court concludes requiring Flat Branch post-lock/post-closing documents and information exceeds the needs of this case and is inappropriate. The Court therefore overrules Fricke's Objection to the Special Master's Report and adopts it, (Doc. 31), in its entirety.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: June 2, 2025                    UNITED STATES DISTRICT COURT

5